IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 20–46–BLG–DLC |
| Plaintiff/Respondent, | |
| vs. | ORDER |
| BRANDON FRANK STRICKER, | |
| Defendant/Movant. | |

In June 2020, Defendant Brandon Frank Stricker was arrested on an eight-count indictment charging him with coercing and enticing multiple minor victims for the purpose of engaging in sexual relations with them and producing sexually explicit material.  (*See* Doc. 1; *see also* Doc. 29 (ten-count superseding indictment).)  He was also charged with attempted sex trafficking of a minor, animal crushing, and attempted witness tampering.  (*See id.*)  In February 2021, he pled guilty to a single count of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2).  (*See* Docs. 29, 54, 55, 63.)  In June 2021, Stricker was sentenced to 168 months of custody followed by twelve years of supervision.  (*See* Docs. 84, 116.)  He now seeks federal habeas relief under 28 U.S.C. § 2255. (Docs. 104, 106, 107, 120, 121, 131.)  As part of his § 2255 claim, Stricker alleges that his trial counsel, Daniel Ball, was ineffective for failing to file a notice of appeal.  An evidentiary hearing was held on September 27, 2024, in Missoula,

Montana.  Based on the evidence, Stricker's motion will be granted as outlined below.

## I.    Background

The record evidence in this case includes Stricker's criminal file through sentencing, (*see* Docs. 1–84), as well as Stricker's pro se filings post-sentencing, (*see* Docs. 85, 88, 94, 96, 99), Stricker's § 2255 filings, (*see* Docs. 104, 106, 107, 120, 131), and the government's Answer and exhibits, (*see* Docs. 128, 129). Additionally, at the September 27, 2024 evidentiary hearing, testimony was heard from Stricker's sister Heather Altenhofen, Stricker himself, and Daniel Ball. Numerous exhibits were also admitted at that hearing, which are referenced in context below.  Ultimately, the Court does not find Stricker's testimony credible. Both Altenhofen and Ball are found credible, however, and their testimony is relied on below.

### A.    Conviction and Sentence

In December 2018, a series of Cyber Tipline reports were filed with the National Center for Missing and Exploited Children by a staff member of Facebook.  Those reports indicated that Stricker was using his Facebook Messenger account to receive child pornography and/or to entice young girls to engage in such behavior.  As part of the investigation that followed, law enforcement interviewed five minor girls that were involved with Stricker from

2018 to 2020.  Those interviews revealed that Stricker would offer the girls a place to stay or employment, ultimately manipulating or pressuring them into having sex with him and/or being featured in sexually explicit photographs or videos. Stricker's residence was searched in April 2020, and law enforcement recovered multiple pieces of electronic media with sexually explicit photographs, videos, and text messages involving the girls in question, as well as other child pornography and a video of Stricker engaged in a sexual act with a horse.  After this search, Stricker created a fake Snapchat account to contact one of the minor victims, attempting to interfere in the investigation.  Stricker was arrested in June 2020.

In February 2021, Stricker pled guilty to a single count of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2), pursuant to a binding plea agreement under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. (*See* Docs. 29, 54, 55, 63.)  That agreement, provided, *inter alia*, that:

- the parties agreed to a sentencing range of 84 months to 240 months, (*see* Doc. 54 at ℙ 6);

- Stricker "agree[d] and admit[ted] all conduct reflected in the Superseding Indictment shall be considered relevant conduct for purposes of sentencing," (*id.* ℙ 2); and

- Stricker "knowingly waive[d] any right to appeal or collaterally attack any aspect of the sentence, including conditions of probation of

supervised release" as well as "challenges to the constitutionality of any

statute of conviction and arguments the admitted conduct does not fall

within any statute of conviction.  This waiver does not prohibit the right

to pursue a collateral challenge alleging ineffective assistance of

counsel," (*id.* ⁋ 8).

During the plea colloquy, the magistrate judge emphasized the appeal waiver,

specifically stating: "once your appeal is accepted and Judge Christensen accepts

the terms of the recommended sentencing range, you'll have waived your right to

appeal any aspect of your sentence to the Ninth Circuit Court of Appeals."  (Doc.

63 at 18–19.)  Stricker confirmed he understood the terms of that waiver.  (*Id.* at

19.)

On June 16, 2021, Stricker was sentenced to 168 months of custody

followed by twelve years of supervision.  (*See* Docs. 84, 116.)  Stricker's

sentencing hearing lasted four hours, with the bulk of that time being devoted to

determining what constituted "relevant conduct" under USSG §1B1.3.

Specifically, the government sought an additional obstruction enhancement, and

Stricker argued that the government failed to prove the facts used to enhance his

sentence by eight levels for the exploitation of "Jane Doe 1" (from an offense level

32 to an offense level 40),  (*see* PSR ⁋⁋ 44–47), and six levels for the exploitation

of "E" (from an offense level 32 to an offense level 38), (*see* PSR ⁋⁋ 52–55).  (*See*

4

Doc. 116 at 140–43.)  Ultimately, the Court sustained two of Stricker's objections,
(*see id.* at 155–56 (declining to apply the two-level enhancements in ¶ 46 and
¶ 53)), and determined that his total offense level was 37, (*id.* at 159).  With a
criminal history category I, Stricker's advisory Guideline range was calculated to
be 210 to 262 months.  (*Id.*)  The Court recognized, however, that the plea
agreement contained a stipulated sentencing range of 84 to 240 months.  (*Id.* at
160.)

In regard to appeal, the Court made two specific references at the sentencing
hearing that are relevant here.  First, in discussing relevant conduct, the Court
stated that "there's not a lot of law on this subject, and there certainly isn't any law
that is clear that discusses this issue as it's being framed in the context of this
particular case.  Now maybe this particular case is the one where the law will be
articulated and cleared up by the Ninth Circuit."  (Doc. 116 at 152.)  Second, at the
end of the proceeding, the Court informed Stricker: "you have waived your right of
appeal, but I need to tell you what that right is anyway.  You will have 14 days
from the date of entry of judgment in which to appeal.  Judgment will be entered
today, so that 14-day time period will begin to run today.  If you do not appeal
within that 14-day time period, any appeal would be barred.  Do you understand
that, sir?"  (*Id.* at 188–89.)  Stricker confirmed that he understood.  (*Id.*)  Ball also
testified that during the mid-morning recess, he and Stricker briefly discussed the

case and that Ball was concerned that Stricker was overly optimistic about the sentence he would receive.  Thus, at that point, Ball reminded Stricker that he had waived his right to appeal and that there would not be an appeal.

**B.     Post-Sentencing – Appeal Period**

The greatest schism between Stricker's version of events and Ball's version occurs directly after sentencing.  According to Stricker, as he was being led out of the courtroom by the Marshals, he told Ball "I want to appeal," and Ball responded that he would "come see" Stricker.  Stricker testified that if he had spoken to Ball after the sentencing, he would have told him to file an appeal even if Ball had reminded him of the appeal waiver and the dangers of potentially breaching the plea agreement.  In turn, Ball testified that Stricker did not speak to him as he was leaving the courtroom and never told him directly or indirectly to appeal.  It is undisputed, however, that after June 16, Ball and Stricker did not speak to each other again, either over the phone or in person.  Their limited, somewhat indirect, contact is discussed below.

The day after sentencing, Stricker spoke with his then-wife, Alizee Moreau, on the phone.  (*See* Def. Ex. A.)  During that call, Moreau indicated that she had spoken to Ball and that Stricker had waived his right to appeal.  (*Id.*)  Ball's internal notes corroborate the fact that Ball spoke with Moreau on June 17 and that the two had spoken about an appeal.  (*See* Govt. Ex. 8.)  Specifically, Ball

explained that his notes reflect that Moreau "asked about appeal," he explained that there would be "no appeal," and that "they," which Ball represented to mean Moreau, Stricker, and Stricker's family, "understand but want to confirm" and that "if [Stricker] had questions" he should "call." (*Id.*)  Ball testified that if Moreau had told him during their phone call that Stricker wanted to appeal or planned to appeal that he (Ball) would have promptly visited Stricker at the detention center.

Also on June 17, Ball sent a letter addressed to Stricker in the detention center. (*See* Govt. Ex. 2, Doc. 154 at 2.)  That letter contained Stricker's Judgment and stated, *inter alia*: "I understand that there will not be an appeal in this matter and that right to appeal was waived in the plea agreement.  Please immediately let me know if you have any questions about that." (*Id.*)  Stricker denies that he ever received this letter.

Stricker spoke to Moreau again on June 18, once again expressing frustration with the sentence he had received and the fact that nothing could be done about it. (*See* Def. Ex. B.)  The two spoke again on June 19, once again lamenting the Court's relevant conduct determinations. (*See* Def. Ex. C.)  During that call, Stricker told Moreau that he wanted to appeal the decision. (*Id.*)  There was another call on June 21, and in this call, Stricker and Moreau argued about whether an appeal was possible, and Stricker asked Moreau to research his options. (*See* Def. Ex. D.)  Stricker also indicated that he did not think that Ball was ever

7

going to talk to him again.  (*Id.*)  On June 24, Stricker spoke to Moreau again and told her that he was going to try to get ahold of Ball to discuss the relevant conduct and appeal options.  (*See* Def. Ex. E.)  During this same timeframe, Stricker and Moreau also exchanged numerous text messages through the detention center's messaging program.  (*See* Govt. Ex. 4, Doc. 154 at 4–15.)  Although those messages contain some references to "relevant conduct," (*see, e.g.*, *id.* at 8), and Stricker's criminal "file," (*see, e.g. id.* at 10), they do not reference an appeal.

Stricker testified that he repeatedly attempted to call Ball during this timeframe but was never able to get through to either Ball or anyone at his office. Stricker also stated that he tried to add Ball to his approved communications list for the detention center's messaging system, but that Ball never "accepted" the request.  Finally, Stricker testified that before he was transferred to a different facility at the end of June, he attempted to file his own notice of appeal with the help of a fellow inmate.  Stricker stated that he labeled the filing as "legal mail" and gave it to an officer at the detention center.  No such letter was ever received by the Court.

Although bereft of a specific timeframe, Stricker's sister testified that she and the rest of Stricker's family had been in contact with Ball prior to the sentencing and were surprised by the length of incarceration imposed.  Ms. Altenhofen testified that she attempted to call Ball after the sentencing because the

family all agreed that some action needed to be taken but that she never actually spoke to Ball.

### C.    Post-Sentencing – Months After

The record contains no evidence that Stricker attempted to contact Ball in the months immediately following sentencing.  On September 21, 2021, however, Stricker sent Ball a letter asking for his case file, stating: "please explain to me why you feel I cannot appeal all or most of the 'relevant conduct' and why none of my 4 previous letters have been responded to."  (Govt. Ex. 5, Doc. 154 at 16.) Notably, despite Stricker's testimony that he had never seen Ball's June 17 letter directly after sentencing, this September 21 letter specifically requests that Ball provide Stricker with "my entire case file including everything from search + seizure to judgement [sic] and *last letter dated around June 26th mailed to me in county*."  (*Id.* (emphasis added).)

Stricker sent another letter to Ball on September 28, once again requesting his case file and transcripts.  (Govt. Ex. 6, Doc. 154 at 17.)  Ball responded to both letters on October 7, stating, in relevant part:

> [W]e discussed your plea agreement in depth.  We discussed the discovery in the case in depth.  We discussed the waiver of appeal set forth in the Plea Agreement.  We discussed that the relevant conduct related to conduct alleged in the Superseding Indictment and discovery would be used against you at sentencing; however, the charges and applicable mandatory minimums related to those counts would be dismissed.  We discussed the possibility that filing an appeal could potentially be considered a breach of the plea agreement.  Indeed, we

9

also discussed that we [sic] when we submitted our initial objections to the PSR that there was concern that even doing that would potentially be in violation of the plea agreement. We discussed that there was a substantial likelihood (actually guarantee) that you would receive a custodial sentence due to the mandatory minimum at issue and due to the plea agreement terms itself. Nonetheless, we advocated for a house arrest sentence and for permission for you to report once your facility was designated. [****] Although you appear not to agree now, the plea agreement was of substantial value to you. You also felt that the sentencing hearing was going very well, although I had some concerns about the testimony and its effect on the sentence.

(Govt. Ex. 7, Doc. 154 at 18.) Contemporaneously with this, the record shows that Stricker filed a pro se motion to extend the time to appeal on October 6, (Docs. 85, 86), and that Ball made notes to himself in Stricker's file about the case, (Def. Ex. J (sealed)).[1] Ball testified that he began to review the file in anticipation of where he foresaw Stricker was headed, i.e., a habeas proceeding.

### D.    Procedural History

Stricker filed his first § 2255 motion in June 2022. (Doc. 104.) He supplemented that motion in July and September 2022. (Docs. 106, 107.) Counsel was appointed, (Doc. 112), and filed an amended § 2255 motion in August 2023, (Docs. 120, 121). The government was ordered to respond, (Doc. 122), and filed its Answer and exhibits in December 2023, (Docs. 128, 129). Stricker filed his

---

[1] These file notes were handwritten on a printed-out email received by Ball's law firm from Moreau on July 8, 2021. That email was unrelated to Stricker's criminal case and Ball testified that he made the notes on a copy of the email that had simply been printed and added to Stricker's hard copy file.

reply in January 2024.  (Doc. 131.)  Stricker's § 2255 motion is premised on two

grounds: first, the Court's Rule 11 inquiry failed to establish that his plea was

knowing, voluntary, and supported by a factual basis, violating his Fifth

Amendment right to due process; and second, that his guilty plea and sentence

were the product of ineffective assistance of counsel, in violation of the Sixth

Amendment.  (Doc. 120 at 2.)  Importantly, as part of his second claim, Stricker

alleges that Ball was ineffective for failing to file a notice of appeal after being

directed to do so.  Given the conflicting record evidence on this issue, an

evidentiary hearing was held on September 27, 2024.  Stricker's other habeas

claims have been stayed pending resolution of Stricker's appeal claim.  (*See* Doc.

145 at 4.)

## II.    Legal Standard

Claims of ineffective assistance of counsel are governed by *Strickland v.*

*Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a defendant who claims

ineffective assistance of counsel must prove (1) "that counsel's representation fell

below an objective standard of reasonableness," *id.* at 687–88, and (2) that any

such deficiency was "prejudicial to the defense," *id.* at 692.  However, a failure to

appeal when instructed to do so is almost categorically considered ineffective

assistance of counsel, regardless of prejudice to the defendant.  *See Roe v. Flores-*

*Ortega*, 528 U.S. 470, 477 (2000) ("We have long held that a lawyer who

disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable . . . .").  This holds true even if the defendant has waived his right to appeal, presumably making an appeal futile.  *See Garza v. Idaho*, 586 U.S. 232, 242–43 (2019).  Put simply, "it is ineffective assistance of counsel to refuse to file a notice of appeal when your client tells you to, even if doing so would be contrary to the plea agreement and harmful to your client."  *United States v. Sandoval-Lopez*, 409 F.3d 1193, 1197 (9th Cir. 2005).

Alternatively, counsel may be found to have rendered deficient representation on "separate, but antecedent" grounds regarding whether counsel adequately consulted with the defendant about an appeal.  *Flores-Ortega*, 528 U.S. at 478.  In this context, "consult" means to "advis[e] the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes."  *Id.*  While recognizing that the "better practice is for counsel routinely to consult with the defendant regarding the possibility of an appeal," the Supreme Court has "reject[ed] a bright-line rule that counsel must always consult with the defendant regarding an appeal."  *Id.* at 479–80.  Thus, it instead held "that counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably

demonstrated to counsel that he was interested in appealing." *Id.* at 480. "In making this determination, courts must take into account all the information counsel knew or should have known." *Id.* "Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal." *Id.*

## III.   Analysis

Although Stricker's original filing and the September 27 hearing were initially focused on the first type of ineffective assistance identified above—i.e., the failure to follow the express direction of a defendant to file a notice of appeal— the record evidence requires consideration of both appeal-related representation issues. Ultimately, the evidence shows that while Stricker did not expressly direct Ball to file a notice of appeal, Ball's post-sentencing failure to consult with Stricker fell below an objective level of reasonableness in these specific circumstances. Both claims are discussed below.

### A.   Express Direction to Appeal

As indicated above, Stricker alleges that he explicitly told Ball to file an appeal as he was being led out of the courtroom immediately after sentencing. Ball disputes that any such statement was made. Because Stricker's allegation is not credible, this argument fails. Though the following list is not exhaustive,

13

Stricker's credibility is undermined by numerous parts of the record.  The most overwhelming evidence undermining Stricker's claim that he made a direct request for appeal is that other than his self-serving statement, nothing in the record shows such an order was given.  In none of Stricker's recorded conversations with Moreau does he tell her that he already directed Ball to appeal or ask her to follow up with Ball to ensure his order was followed.  Rather, Stricker devotes significant amounts of time discussing and considering what, if any, his post-sentencing options were.  If Stricker had directed Ball to appeal, it is unclear why he and Moreau would have multiple conversations on back-to-back days about whether an appeal could be taken and what issues could be raised.  That uncertainty is also reflected in the testimony of Stricker's sister, insofar as she indicated the entire family was unsure how to proceed in the days following what they described as the imposition of a "disappointing" sentence.  It is also unlikely that Stricker would attempt to file a pro se request for appeal, as he alleges to have done, had he believed his attorney was going to do appeal on his behalf.

Based on the foregoing, Stricker has failed to show that Ball refused to file a notice of appeal following an express direction to do so.

## B.    Failure to Consult

The sufficiency of Ball's post-sentencing consultation with Stricker regarding his appellate options is a much closer call.  It is undisputed that prior to

14

sentencing, Ball and Stricker discussed the appeal waiver and its implications on numerous occasions.  It is also undisputed, however, that following sentencing, Ball had no direct contact with Stricker, on the phone or otherwise.  (*But see* Govt. Ex. 2, Doc. 154 at 2 (Ball's June 17 letter).)  Given Ball's knowledge of the case and his client, it is this second undisputed fact that is problematic here.

Ball testified that both Stricker and his family were "disappointed" in the sentence received and that despite the fact that Stricker had agreed to a Guideline range with a seven-year floor, Stricker truly believed he was going to get house arrest.  Ball also testified that Stricker believed, incorrectly, that the sentencing was going well during the mid-morning break and that Ball felt the need to remind him that if things did not go their way, Stricker had agreed not to appeal.  All of this goes to show that while Stricker received a sentence within the discussed and bargained-for range, *see Flores-Ortega*, 528 U.S. at 480 (noting that "whether the defendant received the sentence bargained for as part of the plea" is relevant to the level of consultation necessary), Ball was aware that Stricker had consistently shown that he did not truly believe he would receive a custodial sentence, let alone one is excess of ten years.  Ball further testified that he knew that Stricker was the type of person that would want to exploit any possible "loophole" or "way out." Thus, Ball was aware that Stricker may want to pursue further options, regardless of how ultimately detrimental they would be to him.

The potential need for further consultation is further evinced by Ball's post-sentencing communication with Moreau.  The day after sentencing, Moreau specifically called Ball and asked him about appeal and the associated options.  While Ball conveyed to her that an appeal had been waived, Ball did not follow up this conversation with Stricker.  Rather, Moreau was the only one that conveyed to Stricker, in somewhat broken English, that Ball had said "no appeal."  The video calls between Moreau and Stricker also show that Moreau's desire to discuss the issue, or take further action on Stricker's behalf on this issue, waned quickly.  There is little dispute that while Stricker spoke to other members of his family during this time, Moreau was his primary point of contact.  In fact, Stricker's sister testified that the family believed Moreau would "wrap up" Stricker's affairs in Billings once he went into custody.  Thus, while Stricker is not found credible, it is very possible that he attempted to contact counsel and was unable to do so.  The Court recognizes the challenges of both the time of his initial detention—COVID lockdowns were still occurring—and the fact that if a prisoner's call goes unanswered, the prisoner generally cannot leave a message.

Ultimately, under the facts of this case, Ball should have consulted with Stricker after sentencing regarding appeal.  That is not to say that an attorney must, as a bright-line rule, always have a direct conversation with a defendant post-sentencing about appeal.  The Supreme Court has, in fact, directly rejected such a

requirement.  *See Flores-Ortega*, 528 U.S. at 479–80.  However, as discussed above, under the facts of this case, Ball's failure to consult with Stricker following sentencing fell below an objective level of reasonableness and that failure prejudiced Stricker as the record shows he would have filed an appeal had the two discussed it.  *See Garza*, 586 U.S. at 242–43.

## IV.   Conclusion

Based on the foregoing, IT IS ORDERED that Stricker's claim that counsel failed to consult with him regarding an appeal is GRANTED.  The judgment of June 16, 2021, as amended, (*see* Docs. 75, 79, 83, 84), is VACATED.  The Clerk is directed to re-enter the Amended Judgment (Doc. 84) as of the date of this Order and time to appeal the criminal judgment shall recommence under Federal Rule of Appellate Procedure 4(b).

IT IS FURTHER ORDERED that the stay is LIFTED on Stricker's remaining habeas claims, and they are DENIED as MOOT.  Because they have not been considered on the merits, a certificate of appealability is DENIED as to those claims.

IT IS FURTHER ORDERED that the Clerk shall close the civil case file by entering judgment in favor of Stricker and against the United States as to the claim regarding appeal.

DATED this 30th day of September, 2024.

Dana L. Christensen, District Judge
United States District Court